## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STUART E. STEINBERG,** *et al.*, | |
| *Plaintiffs*, | Case No. 20-cv-02996-RCL |
| **v.** | Hon. Royce C. Lamberth |
| **REPUBLIC OF THE SUDAN**, | |
| *Defendant.* | |

## UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF THE CONSTITUTIONALITY OF THE SUDAN CLAIMS RESOLUTION ACT AND THE CLAIMS SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES AND SUDAN AND IN SUPPORT OF DISMISSAL OF THE COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

   I.     LEGAL BACKGROUND ............................................................................... 3

         A.  Foreign Sovereign Immunities Act.................................................... 3

         B.  Doctrine of Espousal.......................................................................... 4

   II.    FACTUAL BACKGROUND.......................................................................... 5

   III.  PROCEDURAL HISTORY ......................................................................... 10

ARGUMENT......................................................................................................................... 11

   I.     PLAINTIFFS' CONSTITUTIONAL OBJECTIONS TO THE AGREEMENT AND
        THE SCRA ARE MERITLESS....................................................................... 11

         A.  The Agreement And The SCRA Rationally Distinguish Among Differently
             Situated Claimants........................................................................... 11

         B.  The Agreement And The SCRA Do No Unconstitutionally Impair The
             Plaintiffs' Right To Access The Courts. .......................................... 20

   II.    THE AGREEMENT AND THE SCRA REQUIRE DISMISSAL OF PLAINTIFFS'
        CLAIMS............................................................................................................ 21

CONCLUSION..................................................................................................................... 23

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Am. Ins. Ass'n v. Garamendi,*
539 U.S. 396 (2003) ........................................................................................... 4, 19

*Antolok v. United States,*
873 F.2d 369 (D.C. Cir. 1989) ................................................................................ 4

*Argentine Republic v. Amerada Hess Shipping Corp.,*
488 U.S. 428 (1989) ................................................................................................ 3

*Armour v. City of Indianapolis,*
566 U.S. 673 (2012) .............................................................................................. 13

*\*Asociacion de Reclamantes v. United Mexican States,*
735 F.2d 1517 (D.C. Cir. 1984) ................................................................... *passim*

*Aviation & Gen. Ins. Co. v. United States,*
882 F.3d 1088 (Fed. Cir. 2018) ............................................................................ 19

*\*Bank Markazi v. Peterson,*
578 U.S. 212 (2016) .................................................................................... *passim*

*Belk v. United States,*
858 F.2d 706 (Fed. Cir. 1988) .............................................................................. 19

*Broudy v. Mather,*
460 F.3d 106 (D.C. Cir. 2006) ............................................................................. 21

*Christopher v. Harbury,*
536 U.S. 403 (2002) ........................................................................................ 20, 21

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) .............................................................................................. 12

*Dames & Moore v. Regan,*
453 U.S. 654 (1981) .................................................................................... 5, 16, 19

*\*F.C.C. v. Beach Commc'ns, Inc.,*
508 U.S. 307 (1993) ............................................................................ 12, 13, 17, 18

*Flanagan v. Islamic Republic of Iran,*
87 F. Supp. 3d 93 (D.D.C. 2015) ......................................................................... 16

*In re Terrorist Attacks on September 11, 2001*,
  No. 03-MDL-1570 (S.D.N.Y.)…………….......................................................2, 13

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) ...................................................................................... 22, 23

*\*Mark v. Republic of Sudan*,
  No. 20-cv-3022, 2021 WL 4709718 (D.D.C. Oct. 7, 2021), *appeal filed* No. 21-5250  (D.C.
  Cir. Nov. 8, 2021) ............................................................................................ *passim*

*OBB Personenverkehr AG v. Sachs*,
  577 U.S. 27 (2015) ................................................................................................ 3

*Owens v. Republic of Sudan*,
  826 F. Supp. 2d 128 (D.D.C. 2011) ..................................................................... 15

*Republic of Iraq v. Beaty*,
  556 U.S. 848 (2009) .............................................................................................. 3

*Rux v. Republic of Sudan*,
  495 F. Supp. 2d 541 (E.D. Va. 2007) ................................................................... 16

*Schweiker v. Wilson*,
  450 U.S. 221 (1981) ............................................................................................ 12

*Taitt v. Islamic Republic of Iran*,
  No. 20-cv-1557 (D.D.C.)…………………………………………………….8, 16

*United States v. Carolene Prods. Co.*,
  304 U.S. 144 (1938) ............................................................................................ 13

*United States v. Hughes*,
  514 F.3d 15 (D.C. Cir. 2008) .............................................................................. 20

*United States v. Pink*,
  315 U.S. 203 (1942) ......................................................................................... 5, 19

*Verlinden B.V. v. Cent. Bank of Nigeria*,
  461 U.S. 480 (1983) ............................................................................................ 22

**<u>Statutes</u>**

28 U.S.C. § 1330(a) ..................................................................................................... 3

28 U.S.C. § 1602 .......................................................................................................... 3

28 U.S.C. § 1604 ................................................................................................... 3

28 U.S.C. § 1605A ................................................................................ 3, 4, 10, 22

Consolidated Appropriations Act,
    Pub. L. No. 116-260, 134 Stat. 1182 (2020) ............................................. 8

**Adminstrative and Executive Material**

*Rescission of Determination Regarding Sudan*, 85 Fed. Reg. 82,565-02 (Dec. 18, 2020)......... 17

**Other Authorities**

117th Cong., Dep't of State – Senate Foreign Relations Comm. John T. Godfrey by voice vote on July 14, 2022,
    https://www.congress.gov/nomination/117th-congress/1754....................................6

U.S. Dep't of State, Bureau of African Affairs, *U.S. Relations with Sudan: Bilateral Relations Fact Sheet* (Feb. 4, 2022),
    https://www.state.gov/u-s-relations-with-sudan/.........................................................5

## INTRODUCTION

Foreign sovereigns are generally immune from suit in federal court unless plaintiffs can demonstrate one of the exceptions in the Foreign Sovereign Immunities Act ("FSIA") applies. Plaintiffs filed this case against the Republic of Sudan invoking the FSIA's "terrorism" exception, which allows certain suits against foreign states that have been designated state sponsors of terrorism. However, before Plaintiffs served their complaint on Sudan, the United States and Sudan negotiated a Claims Settlement Agreement ("the Agreement") as part of normalizing diplomatic relations between the two countries. Under the Agreement, the United States espoused and terminated all claims of U.S. nationals against Sudan related to acts of terrorism occurring outside the United States, including Plaintiffs' claims. In exchange, Sudan agreed to pay $335 million to compensate plaintiffs in pending cases in which there had been judgment entered against Sudan, or plaintiffs and Sudan had entered into a private settlement agreement, or Sudan had already been found responsible in federal court. Congress subsequently supported these normalization efforts by passing the Sudan Claims Resolution Act ("SCRA"), which upon certification from the Secretary of State that certain conditions had been satisfied, restored Sudan's sovereign immunity for claims related to terrorist incidents occurring on foreign soil.

Plaintiffs do not dispute that the Agreement espoused and terminated their claims or that the SCRA restored Sudan's sovereign immunity in this case. They instead assert that the Agreement and the SCRA violate their constitutional rights in the same two ways

raised and rejected in *Mark v. Republic of Sudan*, No. 20-cv-3022, 2021 WL 4709718, at \*3-5 (D.D.C. Oct. 7, 2021).[1]

First, they claim that the political branches violated their equal-protection right by irrationally singling them out for disparate treatment—the termination of their claims without compensation—when similarly situated plaintiffs were either permitted to continue pursuing their claims in federal court or were made eligible for compensation. This claim, however, is subject only to rational-basis review, and Plaintiffs are not similarly situated to plaintiffs pursuing claims in *In re Terrorist Attacks on September 11, 2001*, No. 03-MDL-1570 (S.D.N.Y.), or eligible for compensation under the Agreement and the SCRA. The President and Congress acted reasonably in treating their claims differently in exercising their authority over foreign relations.

Second, Plaintiffs contend that the political branches' routine, constitutional actions—espousal of claims and restoration of sovereign immunity—deny them access to the courts. But this undeveloped claim bears little resemblance to a recognized denial-of-access claim, and it fails because Plaintiffs have no interest in—and this Court has no jurisdiction over—the underlying claims.

At bottom, Plaintiffs raise the same arguments to the political branches' efforts to normalize relations with the Republic of Sudan that were rejected in *Mark*. This Court should similarly dismiss for lack of jurisdiction.

---

[1] The *Mark* plaintiffs appealed the Court's dismissal of their claims for lack of jurisdiction. *See* No. 21-5250 (D.C. Cir. Nov. 8, 2021). Briefing has been completed in this appeal, but oral argument has not been set.

# BACKGROUND

## I.     LEGAL BACKGROUND

### A.     Foreign Sovereign Immunities Act

The Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1602 *et seq*, "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 30 (2015) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)). Under that statute, "a foreign state [is] immune from the jurisdiction of the courts of the United States and of the States" unless an exception to immunity applies. 28 U.S.C. § 1604; *see Republic of Iraq v. Beaty*, 556 U.S. 848, 851 (2009). And if a plaintiff cannot establish that one of the FSIA's exceptions applies, the Court lacks jurisdiction over any claims asserted against a foreign sovereign and its agencies. *See Bank Markazi v. Peterson*, 578 U.S. 212, 216 n.1 (2016); 28 U.S.C. § 1330(a) (conferring subject-matter jurisdiction over "any claim … with respect to which the foreign state is not entitled to immunity"); *id*. § 1330(b) (noting same for personal jurisdiction, provided service is appropriate made).

The FSIA includes an exception to sovereign immunity for "any case … in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act[.]" 28 U.S.C. § 1605A(a)(1). This so-called "terrorism" exception creates a private cause of action for U.S. nationals or their legal representatives, *id*. § 1605A(c), and allows appropriate plaintiffs to "obtain a judgment against a foreign state," *Bank Markazi*, 578 U.S. at 216. Importantly, the

terrorism exception applies only if, among other criteria, the foreign state has been designated a "state sponsor of terrorism." 28 U.S.C. § 1605A(a)(2)(A)(i).

**B.    Doctrine of Espousal**

The Constitution vests the political branches with authority over foreign relations between the United States and other sovereigns. *See, e.g.*, *Bank Markazi*, 578 U.S. at 235. "In furtherance of th[is] authority[,]" "Congress and the President have, time and again, as exigencies arose, exercised control over claims against foreign states and the disposition of foreign-state property in the United States." *Id.* Indeed, "[m]aking executive agreements to settle claims of American nationals against foreign governments is a particularly longstanding practice, the first example being as early as 1799, when the Adams administration settled demands against the Dutch Government by American citizens who lost their cargo when Dutch privateers overtook the schooner *Wilmington Packet*." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003).

This type of executive agreement is well grounded in the customary international law principle of espousal—"the mechanism whereby one government adopts or 'espouses' and settles the claim of its nationals against another government." *Antolok v. United States*, 873 F.2d 369, 375 (D.C. Cir. 1989). As then-Judge Scalia explained, the government's "absolute power" "to espouse claims does not depend on the consent of the private claimholder, and the fact that a claim has been espoused provides a complete defense for the defendant sovereign in any action by the private individual." *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1523 (D.C. Cir. 1984) (internal citation omitted). "Once it has espoused a claim," moreover, "the sovereign has wide-

ranging discretion in disposing of it. It may compromise it, seek to enforce it, or waive it entirely." *Id.*

The Supreme Court has long upheld exercises of the espousal power, including when the President exercises that power as part of "rehabilitation of relations between this country and another nation[.]" *United States v. Pink*, 315 U.S. 203, 230 (1942); *see id.* at 240 (Frankfurter, J., concurring) ("That the power to establish such normal relations with a foreign country belongs to the President is equally indisputable."). The Court has also recognized that "Congress has implicitly approved the practice of claim settlement by executive agreement." *Dames & Moore v. Regan*, 453 U.S. 654, 680 (1981).

## II.    FACTUAL BACKGROUND

The United States established diplomatic relations with Sudan in 1956 when it became independent from joint administration by Egypt and the United Kingdom. U.S. Dep't of State, Bureau of African Affairs, *U.S. Relations with Sudan: Bilateral Relations Fact Sheet* (Feb. 4, 2022), https://www.state.gov/u-s-relations-with-sudan/. In 1989, then-Brigadier General Omar al-Bashir seized power in a coup, after which Sudan established links with international terrorist organizations. *See id.* In 1993, the United States designated Sudan a state sponsor of terrorism. *Id.*

The United States and Sudan had hostile relations for nearly 30 years. But in April 2019, a popular uprising overthrew the al-Bashir government. *Id.* A Transitional Military Council governed Sudan until August 2019, "when it agreed to cede power to a civilian-led transitional government[.]" *Id.*

This transitional government took important steps to restore friendly relations with the United States since August 2019. For example, in December 2019, the United States and Sudan announced their intention to exchange ambassadors. *Id.* The Sudanese Ambassador to the United States presented his credentials in September 2020, President Biden announced his nomination for U.S. Ambassador to the Republic of Sudan on February 3, 2022, *id.*,[2] and the Senate confirmed John T. Godfrey by voice vote on July 14, 2022, *see* https://www.congress.gov/nomination/117th-congress/1754.

In support of efforts to normalize relations between the United States and Sudan under the civilian-led transitional government, and to achieve compensation for victims of international terrorism, the United States entered into negotiations with Sudan to resolve pending lawsuits in the U.S. Courts against Sudan for terrorism-related conduct. The negotiations culminated in the Claims Settlement Agreement. *See* Claims Settlement Agreement, U.S.-Sudan, Oct. 30, 2020, T.I.A.S. No. 21-209 (attached as Ex. A.). The Agreement acknowledges the two nations' shared goal of "further develop[ing] the relations[hip] between their two countries … especially in light of Sudan's ongoing transition to democracy" and reflects the countries' agreement that Sudan must address certain pending terrorism-related claims "as part of its effort[s] to fully normalize relations with the United States[.]" *Id.* at 3-4. Its purpose "is to reach a comprehensive

---

[2] In October 2021, the military led by General Abdel Fattah al-Burhan ousted Prime Minister Abdalla Hamdok, a civilian. *See* Bilateral Relations Fact Sheet. As part of a political arrangement, Mr. Hamdok returned as Prime Minister before resigning in January 2022. *Id.* The UN Integrated Transition Assistance Mission, the African Union, and the Intergovernmental Authority on Development are currently facilitating a political process to restore civilian-led government in Sudan.

settlement" that, with respect to acts of terrorism "occurring outside of the United States[,]" (1) espouses and terminates the claims of U.S. nationals against Sudan, (2) "provides meaningful compensation" for the "claims of foreign nationals" who were employees or contractors of the United States, and (3) "bars and precludes" all terrorism-related claims against Sudan in U.S. Courts through legislation restoring Sudan's sovereign immunity, including against "suits and actions with judgments that are still subject to appeal or other forms of direct judicial review[.]" *Id.* art. II, at 5.

In exchange for these provisions, Sudan agreed to transfer $335 million to the United States as a "full and final settlement … through espousal," *id.* art. IV(1), at 7, of all U.S. nationals' claims related to acts of terrorism "occurring outside of the United States of America and prior to the date of execution of th[e] Agreement" on October 30, 2020, *id.* art. II, at 5. This payment provided funds for distribution to plaintiffs in nine lawsuits arising from three particular acts of terrorism: (1) the August 7, 1998 bombing of the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania ("the Embassy Bombings"); the October 12, 2000 bombing of the U.S.S. Cole in Yemen ("the Cole Bombing"); and (3) the January 1, 2008 killing in Sudan of United States Agency for International Development employee John Granville. *Id.* art. III(1)-(2), at 6; *id.* Annex at 10-15. Specifically, these funds were provided to compensate U.S. nationals whose claims were

espoused, to pay a private settlement related to claims in five cases,[3] and to fund a process to distribute compensation to eligible foreign nationals in four identified cases.[4]

Congress supported the Executive Branch's efforts to normalize relations with Sudan by passing the SCRA on December 27, 2020. *See* Pub. L. No. 116-260, tit. XVII, 134 Stat. 1182, 3291 (2020). Three parts of the SCRA are relevant here.

First, Section 1702 sets forth the "sense of Congress" that "the United States should support Sudan's democratic transition" and that "as part of the process of restoring normal relations between Sudan and the United States, Congress supports efforts to provide meaningful compensation to individuals employed by or serving as contractors for the United States Government, as well as their family members, who personally have been awarded by a United States District Court a judgment for compensatory damages against Sudan[.]" SCRA § 1702(1)-(2), 134 Stat. at 3291. Additionally, Congress noted that "the terrorism-related claims of victims and family members of the September 11, 2001, terrorist attacks must be preserved and protected." *Id.* § 1702(3).

Second, Section 1704 reestablishes Sudan's sovereign immunity upon fulfillment of certain conditions. Specifically, this section states that Sudan and its agencies and instrumentalities "shall not be subject" to the FSIA's terrorism exception to sovereign

---

[3] The identified cases were: *Owens v. Republic of Sudan*, No. 01-cv-2244 (D.D.C.); *Khaliq v. Republic of Sudan*, No. 10-cv-356 (D.D.C.); *Taitt v. Islamic Republic of Iran*, No. 20-cv-1557 (D.D.C.); *Granville v. Republic of Sudan*, No. 2018-28 (P.C.A.); *Mwila v. The Islamic Republic of Iran*, No. 08-cv-1377 (D.D.C.).

[4] The identified cases were: *Wamai v. Republic of Sudan*, No. 08-cv-1349 (D.D.C.); *Amduso v. Republic of Sudan*, No. 08-cv-1361 (D.D.C.); *Onsongo v. Republic of Sudan*, No. 08-cv-1380 (D.D.C.); and *Opati v. Republic of Sudan*, No 12-cv-1224 (D.D.C.).

immunity once certain conditions are satisfied. SCRA § 1704(a)(1)(A), 134 Stat. at 3292. Those conditions include the Secretary of State's certification to Congress that Sudan's designation as a state sponsor of terrorism has been formally rescinded, that Sudan made final payments with respect to the private settlement of claims of victims of the Cole Bombing, and that the United States received the funds to pay compensation to Mr. Granville's family and to victims of the Embassy Bombings. *See id.* § 1704(2)(A)-(C), 134 Stat. 3293.[5]

On March 20, 2021, the Secretary of State certified that Sudan had fulfilled these criteria. Under the terms of the Act, therefore, "any … private right of action relating to acts by a state sponsor of terrorism arising under Federal, State, or foreign law shall not apply" against Sudan. *Id.* § 1704(a)(1)(B), 134 Stat. 3292. In addition, the Act specifies that—with a limited exception, *see infra*—this restoration of sovereign immunity "appl[ies] to all conduct and any event occurring before the date of the certification … regardless of whether, or [to] the extent to which, application of that [provision] affects any action filed before, on, or after that date." *Id.* § 1704(b), 134 Stat. 3293.

Third, Section 1706 maintains a carve-out to the restoration of Sudan's sovereign immunity for victims of the September 11, 2001 attacks. This provision states that "[n]othing in this Act shall apply to, be construed to apply to, or otherwise affect … any claim in any of the proceedings comprising the multidistrict proceeding 03-MDL-1570 in

---

[5] Congress also appropriated $150 million to be paid to individuals who "have been awarded a judgment" in a case identified in section (c) of the Agreement's Annex—*i.e.*, the *Wamai*, *Amduso*, *Onsongo*, or *Opati* actions. *See supra* at 7 n.3.

the United States District Court for the Southern District of New York …; or . . . the enforcement of any judgment in favor of such person entered in such proceeding." *Id.* § 1706(c), 134 Stat. at 3295. Those claims were not espoused and "remain pending[.]" *Id.* § 1706(a)(3); *see* Agreement, Ex. A, art. II, at 5 (limiting scope of settlement to claims based on terrorist activities "occurring outside of the United States of America").

### III.    PROCEDURAL HISTORY

Plaintiffs' claims arise from several alleged attacks by Hamas that took place between 2014 and 2018. *See generally* Am. Compl., ECF No. 7 (Nov. 20, 2020). Plaintiffs are victims, family members of victims, and the estates of victims of these attacks, *see id.* ¶¶ 1-36,[6] and they assert a number of tort claims against Sudan under the FSIA's terrorism exception, 28 U.S.C. § 1605A, on the theory that Sudan provided material support to Hamas, *see* Am. Compl. ¶¶ 111-128. All Plaintiffs purport to be U.S. nationals. *See id.* ¶¶ 1-36.

On October 19, 2020, Plaintiffs filed their original complaint eleven days before the Claims Settlement Agreement was signed. *See* ECF No. 1 (Oct. 19, 2022). Plaintiffs amended their complaint about one month later. *See* ECF No. 7 (Nov. 20, 2022). They served Sudan on February 27, 2022, under cover of diplomatic note. *See* ECF No. 19 (Apr. 11, 2022). On April 28, 2022, Sudan moved to dismiss for lack of jurisdiction and failure to state a claim. *See generally* ECF No. 23-1 at 5-10 (Apr. 28, 2022). Plaintiffs opposed this

---

[6] The numbering of paragraphs in the amended complaint restarts on page 8. Unless otherwise noted, citations to paragraphs in the amended complaint refer to the restarted paragraph numbers.

motion. ECF No. 24 (May 12, 2022). In their opposition, they acknowledge that the United States settled Plaintiffs' claims through espousal in the Agreement and that the SCRA restored Sudan's sovereign immunity. *See id.* at 12-13. However, they claim that, in doing so, the Agreement and the SCRA violated their right to equal protection and denied them meaningful access to the Courts. *Id.* at 14. Concurrent with this opposition, Plaintiffs filed notice that they were challenging the constitutionality of the Agreement and the SCRA, *see* ECF No. 25 (May 12, 2022), and the Court certified this question to the Attorney General, *see* ECF No. 27 (May 17, 2022).

## ARGUMENT

### I.   PLAINTIFFS' CONSTITUTIONAL OBJECTIONS TO THE AGREEMENT AND THE SCRA ARE MERITLESS.

Plaintiffs do not dispute that the Agreement espouses and terminates their claims or that the SCRA restores Sudan's sovereign immunity with respect to those claims. *See* ECF No. 24 at 1-2. Rather, they contend that the Agreement and the SCRA violate their Fifth Amendment right to equal protection and their right to access the courts. *Id.* at 14-15. As in *Mark*, these contentions are meritless. *See* 2021 WL 4709718, at *4-5.

#### A.   The Agreement And The SCRA Rationally Distinguish Among Differently Situated Claimants.

Plaintiffs first assert that the Agreement and the SCRA violate their equal-protection rights by subjecting them to disparate treatment without a rational basis. *See* ECF No. 24 at 15-16. Specifically, they complain that the Agreement and the SCRA espouse and terminate their claims without providing them meaningful compensation while other plaintiffs' terrorism-related claims against Sudan are permitted to proceed or

are eligible for compensation under the Agreement and the SCRA. *See* ECF No. 24 at 15-16. But Plaintiffs are not similarly situated to those other plaintiffs and their claims, and while Plaintiffs may prefer that the political branches drew different distinctions, the President and the Congress had rational bases for entering into the Agreement and enacting the SCRA.

      1.     Plaintiffs acknowledge that their equal-protection claim is subject to rational-basis review. ECF No. 24 at 15. Under this "relatively relaxed standard[,]" *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981), "legislation is presumed to be valid and [must] be sustained if the classification drawn by the statute is rationally related to a legitimate state interest[,]" *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). "Where there are 'plausible reasons' for Congress' action," the Court's "inquiry is at an end." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993) (citation omitted). "As long as the classificatory scheme chosen … rationally advances a reasonable and identifiable governmental" objecting, reviewing judges "must disregard the existence of other methods of allocation that [they], as individuals, perhaps would have preferred." *Schweiker*, 450 U.S. at 235.

      Plaintiffs bear the burden of demonstrating the Agreement and the SCRA do not meet this standard. To do so, they must "negative every conceivable basis which might support" the challenged classifications. *Beach Commc'ns*, 508 U.S. at 315. Contrary to Plaintiffs' suggestions, *see* ECF No. 24 at 16, it makes no difference whether the political branches articulated rational reasons for their actions at the time: "[I]t is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged

distinction actually motivated" the challenged action. *Beach Commc'ns*, 508 U.S. at 315. A court should not deem a law unconstitutional unless "it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators." *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012) (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1938)).

2.      Plaintiffs fault the SCRA for "selectively creat[ing] an enormous exception" to the restoration of Sudan's sovereign immunity for "9/11 victims who had claims pending in the September 11th MDL litigation pending in the Southern District of New York." ECF No. 24 at 16. However, Plaintiffs are not similarly situated to the 9/11 plaintiffs whose terrorism-related claims against Sudan were not espoused and terminated. And the decision to distinguish between those claims and more recently filed claims arising from terrorism on foreign soil is not irrational.

The September 11, 2001 attacks stand apart from other terrorism incidents in American history. Those attacks took place on U.S. soil and resulted in the largest number of fatalities ever within the United States at the hands of foreign adversaries. The litigation related to those attacks, moreover, has been ongoing for nearly two decades. *See, e.g.*, *In re Terrorist Attacks on September 11, 2001*, 03-MDL-1570, ECF No. 1 (Dec. 10, 2003) (transferring cases filed in 2002 to MDL judge for pre-trial proceedings). In contrast, the Hamas attacks on which Plaintiffs base their claims occurred overseas. And this litigation is of a comparatively more recent vintage. Indeed, Plaintiffs filed their complaint days before the United States and Sudan finalized the Agreement (October 30, 2020), and they served their complaint on Sudan long after the Agreement was executed,

13

the SCRA was enacted (December 27, 2020), and the Agreement entered into force (February 9, 2021).

The Agreement and the SCRA's different treatment of differently situated plaintiffs and their claims is reasonable. As this Court in *Mark* recognized, "[t]he United States could rationally carve out this high-profile tragedy with thousands of American casualties [the 9/11 attacks] as sui generis." 2021 WL 4709718, at *4. Additionally, the Executive Branch, in its judgment of the country's foreign policy needs, determined that settlement of one category of claims—but not others—was necessary to normalize relations with Sudan, and thus, under the Agreement, the United States agreed to espouse only claims of U.S. nationals related to acts of terrorism "occurring outside of the United States[.]" Ex. A art. II, at 5. Congress did not act arbitrarily or capriciously in taking notice that the 9/11 claims were not part of the settlement agreement when restoring Sudan's sovereign immunity in the SCRA. *See* SCRA § 1706(a)(2)(A), 134 Stat. at 3294-95 (recognizing that "[n]either the … [A]greement, nor any other aspect of the effort to normalize relations with Sudan[] … resolved claims against Sudan involving victims and family members of the September 11, 2001, terrorist attacks"). Congress's decision not to restore Sudan's immunity as to the *In re Terrorist Attacks* litigation reflects the same balance that the Agreement struck.

3.    Plaintiffs also fault the Agreement and the SCRA for "distribut[ing] the benefits of the settlement in a selective, arbitrary, and capricious manner." ECF No. 24 at 16. Essentially, they take issue with being denied compensation for their claims. Plaintiffs, however, are not similarly situated to the plaintiffs eligible for compensation under the

Agreement and the SCRA, and the government did not act irrationally in seeking compensation for terrorism-related incidents for which the parties had already obtained judgments against or settlements with Sudan.

There are key differences between Plaintiffs and those plaintiffs whose claims are eligible for compensation under the Agreement and the SCRA. And these differences provide rational bases for the political branches to make certain plaintiffs eligible for compensation, but not Plaintiffs.

First, as the Agreement and SCRA describe, each claimant eligible for compensation under the Agreement had reached a private settlement with Sudan, or received a judgment against Sudan in U.S. courts, or raised claims related to acts for which Sudan had already been found responsible by U.S. courts.

**Embassy Bombing Cases**: Plaintiffs in these cases[7] had either obtained a default judgment against Sudan or reached a private settlement with Sudan or both. *See* Ex. A at 10, Annex; SCRA § 1707(a)(1)(A), 134 Stat. at 3296 (providing for compensation to individuals who "ha[ve] been awarded a judgment"). And not only have these cases reached judgment or settlement, but Sudan has also been found responsible for the Embassy Bombings. *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 143, 146 (D.D.C. 2011).

---

[7] The Embassy Bombing cases include: *Owens*, No. 01-cv-2244, ECF No. 173 (D.D.C. Mar. 25, 2010); *Khaliq*, No. 10-cv-356, ECF No. 18 (D.D.C. Dec. 15, 2010); *Mwila*, 08-cv-1377, ECF No. 22 (D.D.C. Feb. 18, 2010); *Wamai*, 08-cv-1349, ECF No. 34 (D.D.C. June 4, 2010); *Amduso*, 08-cv-1361, ECF No. 29 (Apr. 22, 2009); *Onsongo*, 08-cv-1380, ECF No. 23 (D.D.C. June 2, 2010); and *Opati*, 12-cv-1224, ECF No. 42 (D.D.C. June 18, 2014).

**Cole Bombing Case:** Plaintiffs in *Taitt v. Islamic Republic of Iran*, No. 20-cv-1557 (D.D.C.), whose injuries arose from the Cole Bombing, have also reached a private settlement with Sudan. *See Taitt*, ECF No. 12 (May 11, 2021). And as with the Embassy Bombings, federal courts have previously found Sudan responsible for the Cole Bombing. *See Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 116 (D.D.C. 2015); *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 554 (E.D. Va. 2007).

**Granville Murder Case:** Plaintiffs in *Granville v. Republic of Sudan* before the Permanent Court of Arbitration similarly reached a private settlement with Sudan for claims arising from the killing of United States Agency for International Development ("USAID") employee John Granville on Sudanese soil.

Unlike these cases, Plaintiffs have not obtained final judgment against Sudan or reached a settlement with Sudan. And no U.S. court has found Sudan responsible for the various Hamas attacks allegedly giving rise to Plaintiffs' claims here.

The political branches could reasonably decide that the significant interest in normalizing relations with Sudan was best served by seeking compensation for terrorism-related incidents for which parties had already obtained judgments against or settlements with Sudan or for which Sudan had already been found responsible. *See Dames*, 453 U.S. at 679 (noting that "[n]ot infrequently in affairs between nations, outstanding claims by nationals of one country against the government of another country are sources of friction between the two sovereigns")). In each case eligible for compensation, Sudan had an opportunity to defend itself against the claims before executing the Agreement, whereas Sudan has not yet had that opportunity here. Given

16

the strain that these claims can engender, *cf. id.*, and Sudan's economic realities, limiting compensation to "claims where [Sudan] was already on the hook was rational," *Mark*, 2021 WL 4709718, at *3.[8]

That judgment was particularly reasonable given Sudan's transitional political landscape. Executing the Agreement brought Sudan closer to shedding its designation as a state sponsor of terrorism and lifting the restrictions on certain U.S. foreign assistance and support for international debt relief. *See Rescission of Determination Regarding Sudan*, 85 Fed. Reg. 82,565-02 (Dec. 18, 2020). Contrary to Plaintiffs' contentions regarding "after-the-fact rationalizations of the U.S. government[,]" ECF No. 24 at 18, the Agreement and the SCRA are consistent with rational efforts to secure some justice for past terrorism victims and to prevent future terrorist attacks by supporting a fragile transition to democracy under a government that repudiated support for terrorism.

Second, unlike the attacks on Plaintiffs, the Embassy Bombings, the Cole Bombing, and the murder of John Granville all involved attacks on government institutions, employees, or both. As the Court in *Mark* found, "[i]t is understandable for the United States to prioritize compensation for attacks targeting itself rather than merely its

---

[8] Plaintiffs appear to discount the existence of private settlements as a distinction between their claims and those eligible for compensation because "neither the [*Mark*] court, nor the government in its Statement of Interest, addressed the circumstances of those private settlements, including whether the Government facilitated in achieving the settlements in the run up to the execution of the [Agreement]. ECF No. 24 at 18. However, under rational-basis review, it is Plaintiffs' obligation to "negative every conceivable basis which might support" the challenged classification—not the United States' duty to make any particular showing—evidentiary or otherwise. *Beach Commc'ns*, 508 U.S. at 314 (citation omitted).

nationals." 2021 WL 4709718, at *4. Plaintiffs may challenge the wisdom of this distinction, but "[t]he classifications implicitly created by the [Agreement and the SCRA] are neither at odds with nor 'clearly irrelevant' to the stated goals of the [Agreement] and SCRA of repairing [the United States' and Sudan's] relationship." *Id.* (citation omitted).

4.      Plaintiffs criticize these distinctions for "lack[ing] any unifying theme" and insufficiently furthering the purposes of the Agreement and the SCRA, ECF No. 24 at 19, but at bottom, they attempt to second-guess the specific choices made by the United States in negotiating and reaching an agreement with Sudan, *see id.* ("The [Agreement] and the SCRA place all the burdens of the settlement upon the Plaintiffs and the other HAMAS victims"). That effort is inconsistent with rational-basis review and the broad latitude that courts grant the political branches in establishing and managing foreign relations with foreign governments.

The political branches had to "draw a line for benefits or burdens *somewhere*" in settling outstanding claims again Sudan, and "courts must be especially hesitant to second-guess where that line falls." *Mark*, 2021 WL 4709718, at *3. "Defining the class of persons" who may are eligible for compensation—"much like classifying [all] government beneficiaries—'inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact that the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.'" *Beach Commc'ns*, 508 U.S. at 315-16 (citation omitted). As explained above, Plaintiffs have failed here to justify the Court rewriting the Agreement or the SCRA.

That is particularly true given the discretion the political branches have in conducting the United States' foreign relations. The Supreme Court has long recognized Congress and the President's authority to "exercise[] control over claims against foreign states" arises from their "controlling" authority over foreign relations, *Bank Markazi*, 578 U.S. at 234-35 (collecting history), and the President's constitutional authority to recognize foreign states, *see Pink*, 315 U.S. at 230; *Garamendi*, 539 U.S. at 420 (recognizing that resolving claims of U.S. nationals "is a matter well within the Executive's responsibility for foreign affairs"). From this comes discretion to espouse and settle claims, *see Asociacion de Reclamantes*, 735 F.2d at 1523, and "to decide to whom the settlement funds would be distributed[,]" *Aviation & Gen. Ins. Co. v. United States*, 882 F.3d 1088, 1095 (Fed. Cir. 2018). "[J]udicial inquiry into whether the President could have extracted a more favorable settlement would seriously interfere with the President's ability to conduct foreign relations." *Belk v. United States*, 858 F.2d 706, 710 (Fed. Cir. 1988). Contrary to Plaintiffs, ECF No. 24 at 19, *Dames & Moore* does not state otherwise, *see* 453 U.S. at 679-80 (noting that the President has settled U.S. nationals' claims without consultation with them or "exclusive regard for their interests"). Plaintiffs' invitation to the Court to review and revise the political branches' espousal of claims and reinstatement of sovereign immunity is inappropriate and should be rejected.

**B.      The Agreement And The SCRA Do No Unconstitutionally Impair The Plaintiffs' Right To Access The Courts.**

Plaintiffs also baldly state that the Agreement and the SCRA interfere with their "rights to pursue their claims against Sudan in Court" and are thus subject to strict scrutiny. ECF No. 24 at 20. This claim is meritless. *See, e.g.*, *Mark*, 2021 WL 4709718, at *5.

First, Plaintiffs have failed to develop this argument sufficiently because they have not explained how "routine, constitutionally prescribed actions" close the courthouse doors to Plaintiffs. *Mark*, 2021 WL 4709718, at *4. They offer no explanation for how the President's exercise of his long-recognized authority to espouse their claims constitutes an infringement of their right to access the courts. Nor do they explain how the SCRA's restoration of Sudan's sovereign immunity denies them access to the courts. This argument is accordingly waived. *See United States v. Hughes*, 514 F.3d 15, 18 (D.C. Cir. 2008) (holding that undeveloped arguments are waived).

Second, and for similar reasons, the claim fails on the merits.  The Supreme Court has recognized that Congress has the authority "to alter a foreign state's immunity and to render the alteration dispositive of judicial proceedings in progress."  *Bank Markazi*, 578 U.S. at 236. That legitimate action does not deny Plaintiffs access to the courts.

Moreover, the Supreme Court has recognized two categories of denial-of-access claims: backward-looking and forward-looking. The former typically alleges that severe government misconduct by individual actors, like hiding evidence, has stymied the plaintiffs' ability to pursue relief on a preexisting claim, such that vindicating the right of access itself (such as through a putative *Bivens* suit) is the only route to relief. *See*

20

*Christopher v. Harbury*, 536 U.S. 403, 413-14 (2002). The latter typically alleges that the plaintiffs are impecunious or illiterate or imprisoned, such that "systemic" fees or regulations unduly prevent them from "preparing and filing suits" and removing "the frustrating condition" would enable them to pursue analytically separate claims of injury. *Id.* at 413; *Broudy v. Mather*, 460 F.3d 106, 117 (D.C. Cir. 2006).

Plaintiffs do not explain how their claim fits into either category, and their claim lacks merit however it is categorized. The Supreme Court's decisions in this area "rest on the recognition that the right [to access the courts] is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Harbury*, 536 U.S. at 415. But when the Executive Branch espoused Plaintiffs' claims in the Agreement, it extinguished any interest that Plaintiffs have in those claims. *See Asociacion de Reclamantes*, 735 F.2d at 1523; *supra* at 4-5.

Plaintiffs therefore have not demonstrated an infringement on their right to access the courts, and strict scrutiny is unwarranted.

## II.   THE AGREEMENT AND THE SCRA REQUIRE DISMISSAL OF PLAINTIFFS' CLAIMS.

Because Plaintiffs' constitutional challenges to the Agreement and the SCRA are meritless, their claims should be dismissed for at least three reasons.

First, the Court lacks subject matter and personal jurisdiction over Sudan now that the SCRA has restored Sudan's sovereign immunity. As in *Mark*, no one disputes that the SCRA by its terms restores Sudan's sovereign immunity for claims arising under 28 U.S.C. § 1605A upon the Secretary of State's certification that the conditions outlined in

the SCRA had been met, or that Secretary Blinken made this certification on March 20, 2021. *Mark*, 2021 WL 4709718, at *5. This restoration of sovereign immunity under the FSIA deprives the Court of subject matter and personal jurisdiction over Plaintiffs' claims. *See, e.g.*, *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983) ("[I]f none of the exceptions to sovereign immunity set forth in the [FSIA] applies, the District Court lacks both statutory subject matter jurisdiction and personal jurisdiction.").

That Plaintiffs' claims predate the SCRA is immaterial. Congress has the "prerogative to alter a foreign state's immunity and to render the alteration dispositive of judicial proceedings in progress[,]" *Bank Markazi*, 578 U.S. at 236, and the SCRA expressly applies to "all conduct and any event" before the Secretary's certification, regardless of the statute's effect on "any action filed before … that date[,]" SCRA § 1704(b), 134 Stat. at 3293. By its plain terms, the SCRA thus makes clear congressional intent to restore Sudan's sovereign immunity and for it to apply to all conduct predating March 21, 2021, including to pending claims. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) ("When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach.").

Second, the Court lacks jurisdiction because the Agreement's espousal and termination of Plaintiffs' claims means there is no longer a case or controversy under Article III. Plaintiffs concede, *see* ECF No. 24 at 2, 9, as they must, that the Executive Branch has the authority to espouse the claims of U.S. nationals. *See, e.g.*, *Bank Markazi*, 578 U.S. at 235. Once the Executive Branch has espoused a claim, it "has wide-ranging

discretion in disposing of it. It may compromise it, seek to enforce it, or waive it entirely." *Asociacion de Reclamantes*, 735 F.2d at 1523. Through the Agreement between the United States and Sudan, the Executive Branch espoused and released the claims of U.S. nationals—including Plaintiffs' claims—against Sudan for terrorism-related actions. Ex. A. art. IV(2)(d), at 7-8. Plaintiffs' legal interest in their claims against Sudan has accordingly been extinguished, and because Plaintiffs no longer have a legal interest in those claims, there is no longer an actual case or controversy before the Court. This Court lacks Article III jurisdiction.

Third, even if the Court had jurisdiction—and it does not—Plaintiffs do not have a cause of action after the SCRA expressly eliminated "any … private right of action relating to acts by a state sponsor of terrorism arising under Federal, State, or foreign law" against Sudan "in any action in a Federal or State court." SCRA § 1704(a)(1)(B), 134 Stat. at 3292. Because "a court should apply the law in effect at the time it renders its decision," *Landgraf*, 511 U.S. at 273 (citation omitted), Plaintiffs can no longer state a cause of action against Sudan.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should uphold the constitutionality of the Agreement and the SCRA, and dismiss Plaintiffs' claims.

Dated: July 25, 2022                          Respectfully submitted,

                                              BRIAN M. BOYNTON
                                              Principal Deputy Assistant Attorney General

                                              ANTHONY J. COPPOLINO
                                              Deputy Director
                                              Federal Programs Branch

                                              */s/ Christopher A. Eiswerth*
                                              Christopher A. Eiswerth (D.C. Bar No. 1029490)
                                              Trial Attorney
                                              United States Department of Justice
                                              Civil Division, Federal Programs Branch
                                              1100 L Street, NW, Rm. 12310
                                              Washington, DC 20005
                                              Tel: (202) 305-0568
                                              Email: christopher.a.eiswerth@usdoj.gov

                                              *Counsel for the United States of America*

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing document with the Clerk of the Court through the CM/ECF system on July 25, 2022. This system provided a copy to and effected service of this document to all parties.

/s/ Christopher A. Eiswerth

CHRISTOPHER A. EISWERTH
Trial Attorney (DC Bar #1029490)
United States Department of Justice
Civil Division, Federal Programs Branch