**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| STUART E. STEINBERG, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-02996-RCL |
| | ) | |
| REPUBLIC OF SUDAN | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO UNITED STATES
MEMORANDUM OF LAW IN SUPPORT OF THE CONSTITUTIONALITY OF THE
SUDAN CLAIMS RESOLUTION ACT AND THE CLAIMS SETTLEMENT
AGREEMENT BETWEEN THE UNITED STATES AND SUDAN AND IN SUPPORT OF
DISMISSAL OF THE COMPLAINT**

January 3, 2023                           Respectfully Submitted,

HEIDEMAN NUDELMAN & KALIK P.C.
5335 Wisconsin Ave., Suite 440
Washington, DC  20015
Telephone:  202-463-1818
Telefax:  202-463-2999
Email:  trkalik@hnklaw.com


By:_____/s/ *Tracy Reichman Kalik*_____
        Richard D. Heideman (No. 377462)
        Noel J. Nudelman (No. 449969)
        Tracy Reichman Kalik (No. 462055)
        Joseph H. Tipograph (No. 997533)

## <u>TABLE OF CONTENTS</u>

INTRODUCTION.................................................................................................. 1

I.    The Plaintiffs' Constitutional Objections to the CSA and SCRA Have Merit ...................... 2

 a.   The CSA and SCRA distinguish between similarly situated Plaintiffs ............................. 2

 b.   The CSA and SCRA deny Plaintiffs access to the Courts .................................................. 8

II.   The Plaintiffs' Claims Should Not Be Dismissed Pursuant to the Statutes......................... 10

CONCLUSION ................................................................................................................. 11

# TABLE OF AUTHORITIES

Page(s)

Cases

*Abrahim-Youri v. United States*,
   139 F.3d 1462 (Fed. Cir. 1997)............................................................................................9

*Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*,
   999 F.3d 808 (2d Cir. 2021).................................................................................................7

*Clay v. Socialist People's Libyan Arab Jamahiriya*,
   614 F. Supp. 2d 21 (D.D.C. 2009).......................................................................................9

*Dames & Moore v. Regan*,
   453 U.S. 654, 101 S. Ct. 2972, 69 L. Ed. 2d 918 (1981)...................................................8, 9

*F.C.C. v. Beach Commc'ns, Inc.*,
   508 U.S. 307, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993).................................................5

*Fajardo v. Cnty. of Los Angeles*,
   179 F.3d 698 (9th Cir. 1999)................................................................................................6

*Fortress Bible Church v. Feiner*,
   694 F.3d 208 (2d Cir. 2012).................................................................................................5

*Highway Materials, Inc. v. Whitemarsh Twp.*,
   386 F. App'x 251 (3d Cir. 2010)..........................................................................................6

*Jicarilla Apache Nation v. Rio Arriba Cnty.*,
   440 F.3d 1202 (10th Cir. 2006) ...........................................................................................6

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*,
   863 F.3d 96 (2d Cir. 2017)...................................................................................................7

*Republic of Argentina v. NML Cap., Ltd.*,
   573 U.S. 134, 134 S. Ct. 2250, 189 L. Ed. 2d 234 (2014)..................................................7

*Smith v. City of Chicago*,
   457 F.3d 643 (7th Cir. 2006) ...............................................................................................6

*Squaw Valley Dev. Co. v. Goldberg*,
   375 F.3d 936 (9th Cir. 2004)................................................................................................5

*United States v. Curtiss-Wright Exp. Corp.*,
   299 U.S. 304, 57 S. Ct. 216, 81 L. Ed. 255 (1936)............................................................8

*Verlinden B.V. v. Cent. Bank of Nigeria*,
   461 U.S. 480, 103 S. Ct. 1962, 76 L. Ed. 2d 81 (1983)......................................................7

*XP Vehicles, Inc. v. Dep't of Energy*,
   118 F. Supp. 3d 38 (D.D.C. 2015).......................................................................................5

Statutes

28 U.S.C. § 1391(f).................................................................................................................1

28 U.S.C. § 1603(a) ................................................................................................................1

28 U.S.C. § 1605A ............................................................................................................... 1, 10

PL 110–301 ............................................................................................................................. 9

PL 116-260 ............................................................................................................................. 1

Rules

Fed. R. Civ. P. 5.1(a)(2) ........................................................................................................ 2

Fed. R. Civ. P. 12(b)(1), (2) and (6) ..................................................................................... 1

Other Authorities

*Claims Settlement Agreement Between the Gov't of the United States of Am. & the Gov't of the
Republic of the Sudan*,
    T.I.A.S. No. 21-209 (Feb. 9, 2021) ................................................................................. 1

## INTRODUCTION

Plaintiffs have brought a civil action pursuant to 28 U.S.C. § 1605A.  The Plaintiffs are U.S. nationals who seek to hold the Defendant, the Republic of Sudan ("Sudan")[1] liable for the wrongful death, severe personal injuries and related torts which resulted from terrorist attacks perpetrated by the Islamic Resistance Movement ("HAMAS").  Each of the Plaintiffs, being the estates, survivors and/or family members of Max Steinberg, Eitam Simon Henkin, Ari Fuld, and injured Plaintiffs Asher Goodman, Batsheva Goodman, Ephriam Rosenfeld A.R., B.R., H.R., Bracha Vaknin, S.M.V., E.V., M.V., S.R.V., and A.V. bring this action against Sudan for its substantial material support and sponsorship of HAMAS leading up to and after the terrorist attacks that killed and/or injured the Plaintiffs. Defendant Sudan seeks dismissal of Plaintiffs' Complaint with prejudice arguing that the Court should dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1), (2) and (6).  Plaintiffs have opposed Defendants' Motion arguing that the *Claims Settlement Agreement Between the Gov't of the United States of Am. & the Gov't of the Republic of the Sudan*, T.I.A.S. No. 21-209 (Feb. 9, 2021)("CSA") between the United States and Sudan is unconstitutional in its application to the Plaintiffs' claims.  The Plaintiffs also raised the unconstitutionality of the Sudan Claims Resolution Act, enacted as part of the Consolidated Appropriations Act of 2021 in their Opposition to the Motion to Dismiss. CONSOLIDATED APPROPRIATIONS ACT, 2021, PL 116-260, December 27, 2020, 134 Stat 1182 et seq ("SCRA").  As this case challenged the constitutionality of the CSA and SCRA on the grounds that they violate the Plaintiffs' right to equal protection of the laws and their right to access to the

---

[1] Defendant Sudan is a foreign state within the meaning of 28 U.S.C. § 1603(a) and 28 U.S.C. § 1391(f). On August 12, 1993, Defendant Sudan was designated a State Sponsor of Terrorism pursuant to the Export Administration Act of 1979, Arms Export Control Act of 1976, and Foreign Assistance Act of 1996 and remained so designated at the time Plaintiffs suffered their injuries and at the time Plaintiffs filed their First Amended Complaint.

1

courts, on May 12, 2022, Plaintiffs put the Attorney General of the United States on notice of the constitutional questions raised. Fed. R. Civ. P. 5.1(a)(2). The United States then sought to intervene in this matter and on December 20, 2022 this Court granted the government's motion.   On December 22, 2022, the government's Memorandum of Law in Support of the Constitutionality of the Sudan Claims Resolution Act and the Claims Settlement Agreement between the United States and Sudan and in support of Dismissal of the Complaint was filed and served.   Plaintiffs now file this response in Opposition to the governments' Memorandum.

## ARGUMENT

I.      **The Plaintiffs' Constitutional Objections to the CSA and SCRA Have Merit**

   a.  **The CSA and SCRA distinguish between similarly situated Plaintiffs**

Sudan and the government argue that the Plaintiffs and the claimants who are being compensated under the CSA are not similarly situated, in that those claimants were compensated through "private settlement agreements" for which the government was not a part. (Gov. Mem at 15).  However, Sudan and the government misrepresent the relationship between the CSA and the so-called "private settlement agreements," and they falsely deny the government's involvement in those "private" agreements. The CSA affirms that "Sudan has already paid compensation pursuant to certain private settlements to a number of victims" of Sudan-sponsored terrorism. See CSA, Recitals, Annex.  It also provides that part of the funds to be paid by Sudan pursuant to the CSA would be used to compensate those claimants who had previously entered into "private settlement agreements" Thus, the CSA refers to the "private settlement agreements" as if they were achieved independently of, and prior to, the CSA. The government has also defended the constitutionality of the CSA and the SCRA by arguing that, unlike the Plaintiffs here, the victims of Sudan-sponsored terrorism who were compensated under the CSA had claims in which Sudan's liability

was already resolved either by default judgment or by private settlement agreement. (Gov. Mem at 15).  But the CSA is internally inconsistent in that it states in the recitals that Sudan has already paid compensation to claimants under the "private settlement agreements," and, in the Annex, it states that the United States "shall" use the funds to be provided by Sudan to pay those "private settlement agreements."  Sudan and government argue that all of these private settlement agreements were negotiated and completed prior to the adoption of the CSA, and since the Plaintiffs did not yet have private settlement agreements negotiated or default judgments entered, the Plaintiffs are sufficiently different and not similarly situated from the ones who received compensation.  However, this is neither entirely the case.  In giving credit to the supposedly private nature of such agreements, the government itself is abrogating its own responsibilities to protect the interests of pending U.S. Plaintiffs; and should not be permitted to simply sweep them away or under the rug, as if they did not exist.

The government states that the family of John Granville was compensated because there was a privately negotiated settlement agreement.  Gov. Brief p. 16.  It implies that this was completed prior to the completion of the CSA.  *Id.*  But on June 11, 2021, USAID issued a press release that stated, in pertinent part, that in May [2021], the family of John Granville, a United States Agency for International Development (USAID) employee killed in Sudan in 2008, received compensation through a private settlement with the government of Sudan. The government of Sudan agreed to compensate specific victims of terrorist attacks ***as part of the negotiations*** for restoration of Sudan's sovereign immunities. *See*, Office of Press Relations, USAID, Statement by Administrator Samantha Power, Compensation Delivered to Family of USAID Employee Killed in Line of Duty in Sudan (June 11, 2021), https://www.usaid.gov/news-information/press-releases/jun-11-2021-     compensation-delivered-family-usaid-employee-killed-line-duty-sudan

(emphasis added). While the first sentence of the press release may use the words "private settlement agreements", these words belie the true facts; *to wit*, there was another agreement (*i.e.* CSA) under which Sudan would (in the future) compensate "specific victims ... as part of the negotiation for restoration of Sudan's sovereign immunities." The only party that could have been in a position to restore Sudan's sovereign immunity was the United States. Thus, USAID's press release demonstrates that United States extracted from Sudan an agreement to enter the so-called "private settlement agreements" as a condition to the restoration of Sudan's foreign governmental immunity under the CSA, thus not every claimant, such as John Granville who received compensation from the CSA had completed a private settlement agreement.  His inclusion shows that the government advocated for some victims of Sudanese terror, while ignoring the claims of others, such as the instant Plaintiffs. By disclosing the government's involvement in the "private settlement agreements," and the fact that they were part of the CSA, the press release belies both the factual assertions and the legal force of Sudan's claim that the so-called "private settlement agreements" are not subject to constitutional review because they are agreements between private parties and do not involve state action by any U.S. government entity."  It also belies the argument that the distribution by the United States of the subsequently paid settlement funds pursuant to these purportedly private settlement agreements was not state action because the United States was merely carrying out the terms of these private agreements.

The USAID press release makes clear that, contrary to the "rational basis" argument, the so-called "private settlement agreements" were not the reason specific claimants were compensated under the agreements between the United States and Sudan and demonstrates on its face the disparate treatment of these Plaintiffs. The government's involvement in the "private settlement agreements" demonstrates that rather than justifying the disparate treatment of the

Plaintiffs, the "private settlement agreements" constitute one more example of disparate treatment and require justification to withstand constitutional scrutiny.

The government cites *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993) for the proposition that "where there are 'plausible reasons' for Congress' action the Court's inquiry is at an end.  Gov. Br. at 12. Notably, the *Beach Communications* dictum refers specifically to legislative action and therefore, by its terms, it is inapplicable to the CSA. More significantly, *Beach Communications* merely upheld the principle that the government need not articulate "the purpose or rationale supporting its classification." *Beach F.C.C.*, 508 U.S. at 315. The Court even held that "rational speculation" as to the basis for governmental action may suffice. *Id.* However, the Court did not hold that patently false rationalizations – like the Plaintiffs' claims here -- withstand rational basis review. The federal courts of appeal are split on the question of whether a plaintiff may pursue an equal protection claim by raising a triable issue of fact as to whether the government's asserted rational basis is merely a pretext for disparate treatment. *See, XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38 (D.D.C. 2015) (discussing circuit split and finding that the D.C. Circuit has not yet addressed the issue). Thus, in *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 945–46 (9th Cir. 2004), the court held that "a plaintiff may pursue an equal protection claim by raising a triable issue of fact as to whether the defendants' asserted rational basis was merely a pretext for differential treatment." The Second Circuit agrees. *See, Fortress Bible Church v. Feiner*, 694 F.3d 208 (2d Cir. 2012). Under these cases, because the government's justification for discriminating against the Plaintiffs is pretextual, the government's actions are arbitrary, and they violate the equal protection clause. *Fajardo v. Cnty. of Los Angeles*, 179 F.3d 698, 700 n.2 (9th Cir. 1999). Other courts of appeal hold that a mere claim that the government's proffered rationale is pretextual does

not defeat government action under rational basis review. *See e.g., Highway Materials, Inc. v. Whitemarsh Twp.*, 386 F. App'x 251 (3d Cir. 2010) (allegation of pretext insufficient to establish equal protection violation); *Jicarilla Apache Nation v. Rio Arriba Cnty.*, 440 F.3d 1202 (10th Cir. 2006) ("pretext is not an issue"); *Smith v. City of Chicago*, 457 F.3d 643, 651 (7th Cir. 2006) (claims of pretext do not negate rational basis). This Court should follow the Second and Ninth Circuits in holding that pretext alone suffices to defeat proffered justifications for governmental classifications that treat similarly situated parties disparately. But, even if the Court holds that claims of pretext do not overcome an otherwise rational basis, it should still reject the rationalizations proffered by Sudan and the government. The proffered rationale that the CSA compensated terrorism victims for whose claims Sudan's liability had already been established (including by "private settlement agreement") prior to the CSA is not merely pretextual in that it was not a true reason the Plaintiffs were denied participation. And it is not merely pretextual in that it is not a credible reason for the government to act to include some claims while ignoring and essentially singling out certain Plaintiffs (such as these Plaintiffs)[2] Rather, the rationale is based upon objectively false factual allegations designed to conceal the fact that the government entered into an undisclosed agreement with Sudan under which Sudan agreed to enter the so-called "private settlement agreements" with only particular claimants. Thus, "private settlement agreements" were concluded between Sudan and the *favored* claimants. The misrepresentation of the relationship among the various agreements is so egregious that it calls into question the other justifications proffered by the government.

---

[2] As the Court is aware, these same issues and defenses (although with different arguments asserted here) have been considered in *Mark et al., v. Republic of Sudan,* No. 21-5250 (D.C. Cir) ("*Mark* Appeal")*,* which is currently on appeal in the United States Court of Appeals for the D.C. Circuit. Oral argument was held on October 28, 2022.  No opinion has been issued.

Moreover, the disparate treatment between these Plaintiffs and the 9/11 victims who had pending claims against Sudan in the *In re Terrorist Attacks on September 11, 2001,* 03-MDL-1570 further highlights the disparate treatment accorded to these Plaintiffs. The government and Sudan suggest that because the 9/11 attacks were committed on U.S. soil and were committed more than two decades ago justifies the application of disparate treatment. Gov't Brief at 13. However, the fact that these claims occurred "overseas" and are of "more recent vintage" is nonsensical and neither is justifiable, nor does it raise to the level of acceptable different treatment amongst similarly situated claimants. Rather it returns the application of FSIA immunity and espousal to an *ad hoc* application without the equal protection guarantees of the Constitution. But the FSIA was created to avoid this disparity of treatment.

Until the enactment of the FSIA, foreign sovereign immunity decisions were made at the discretion of the government. The governing standards were "neither clear nor uniformly applied." *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 141, 134 S. Ct. 2250, 2255, 189 L. Ed. 2d 234 (2014) *citing Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488, 103 S. Ct. 1962, 1968, 76 L. Ed. 2d 81 (1983). But all that changed in 1976, when Congress "abated the bedlam" by passing the FSIA. *Id.* In the FSIA, Congress set forth "a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies[,] or instrumentalities" and vested sole responsibility for applying those standards in the federal judiciary. *Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 818 (2d Cir. 2021), *see Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 104 (2d Cir. 2017).

By treating these Plaintiffs, who like the 9/11 claimants, had claims pending at the time CSA and SCRA were enacted, the "bedlam" that the FSIA was created to avoid has once again

been revived, thereby resulting in arbitrary and capricious distinctions among the victims of Sudan-sponsored terrorism, singling out these and other similarly situated HAMAS victims as the only victims who had their claims espoused without receiving any compensation or being denied the opportunity to continue to pursue their claims, unlike the 9/11 victims. These Plaintiffs are no less damaged nor or their losses any less tragic. Yet they have singularly been carved away without justification that passes constitutional muster.

### b.   The CSA and SCRA deny Plaintiffs access to the Courts

The CSA and SCRA produced an unprecedented settlement in which the claims of a few claimants were traded in exchange for compensation for other claimants while leaving the uncompensated claimants with no procedure, mechanism of forum in which to seek relief. In *Dames & Moore v. Regan*, 453 U.S. 654, 101 S. Ct. 2972, 69 L. Ed. 2d 918 (1981), the Supreme Court upheld the president's power to espouse claims of U.S. nationals against Iran. However, the Court emphatically rejected the assertion that the President enjoyed "plenary power to settle claims, even as against foreign governmental entities." *Id.* at 688; *see also, id.* at 662 (comparing such unlimited power to that exercised by George III and rejected by the signatories of the Declaration of Independence). The Court cautioned that the power to settle claims, "like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution." *Id.* at 661 quoting *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–320, 57 S. Ct. 216, 81 L. Ed. 255 (1936).

In *Dames & Moore*, the Supreme Court upheld the government's settlement, in part, because the government created a procedure by which the proceeds of the settlement would be distributed among the plaintiffs whose claims were espoused. *Dames & Moore*, 453 U.S. at 680, 686–87. The requirement to provide either compensation or an alternative forum or mechanism through which

plaintiffs whose claims are espoused is fundamental. Neither Sudan nor the government cite a single case in which U.S. nationals' claims were espoused without receiving some such benefit. On the contrary, when looking at other terrorism cases which were included as part of nation-to-nation settlements, those negotiations provide recompense or other recourse for all claimants. *See e.g.*, *Dames & Moore*, 453 U.S. at 680, 686–87 (upholding the Algiers Accords and discussing various other claims settlement initiatives that allocated funds to U.S. nationals); *Abrahim-Youri v. United States*, 139 F.3d 1462 (Fed. Cir. 1997) (affirming dismissal of takings claims where claimants received the full principal amount of their claims without interest). Moreover, these cases made the benefits of the various settlements available to all U.S. national claimants. Indeed, in a comparable settlement reached between the United States government and the Socialist People's Libyan Arab Jamahiriya (Libya), the Department of State engaged in a comprehensive review of cases to ensure that all U.S. nationals with terrorism claims were included in the subsequently signed claims settlement agreement between the United States and Libya. LIBYAN CLAIMS RESOLUTION ACT, PL 110–301, August 4, 2008, 122 Stat 2999 ("LCRA").  When the LCRA was enacted, the U.S. government scoured records and took affirmative steps to be sure that every claim pending against Libya was given the opportunity to be included.  This inquiry ensured that all U.S. nationals with pending claims were treated fairly in the settlement of their claims pursuant to the LCRA. *See Clay v. Socialist People's Libyan Arab Jamahiriya*, 614 F. Supp. 2d 21 (D.D.C. 2009) (noting the LCRA required the U.S. government to certify that Libya deposited sufficient funds to ensure fair compensation of all U.S. national claims).  By contrast, in negotiating the CSA and in enacting the SCRA, the government deliberately denied these Plaintiffs compensation and any procedure through which they could obtain compensation. Here, neither the U.S. Department of State nor any other branch of government took steps to assure that every claim

9

pending against Sudan was given the opportunity to either be included or to have an alternate remedy.  The failure by the U.S. government is egregiously offensive to the rights of these Plaintiffs and inherently violative of the essence of justice.  There is no alternative forum for these Plaintiffs to bring their claim for damages such as in a court elsewhere or through a takings claim in the U.S. Court of Federal Claims. The government did not only revoke the jurisdictional grant and the federal cause of action, it espoused and settled the Plaintiffs' claims against Sudan. *See* CSA, Art II, Addendum 13. Therefore, those claims can no longer be brought in any forum. Moreover, neither the CSA nor the SCRA provide that the Plaintiffs may bring a takings claim against the government. Therefore, as the CSA and SCRA have provided the Plaintiffs with no compensation, benefits, or alternative mechanism to seek relief, this distinguishes their case from relevant takings case precedents, an egregious offense to the rights of those Americans killed and injured, and their families, which cannot be allowed to stand.

## II.     The Plaintiffs' Claims Should Not Be Dismissed Pursuant to the Statutes

The government argues that once the Court applies and enforces the CSA and SCRA, then the Court lacks both personal and subject matter jurisdiction over the Defendant Sudan.  However, if this Court finds that the SCRA is unconstitutional, as it should, then Sudan's claim of immunity under the Foreign Sovereign Immunities Act ("FSIA") would not apply. Sudan would have no claim of immunity protection and as a designated state sponsor of terrorism at the time the Plaintiffs were killed and/or injured, and at the time the Plaintiffs timely-filed their Complaints, this Court would and should indeed have jurisdiction over the Plaintiffs' claims.  28 U.S.C. § 1605A.  The facts alleged and incorporated in Counts I, II, III and IV of Plaintiffs' First Amended Complaint demonstrate that Sudan engaged in the systematic provision of material support to HAMAS, the terrorist group which injured and murdered these Plaintiffs. Provision of material

10

support in the form of financing, weapons, training and passports have all been alleged by the Plaintiffs in their FAC.  FAC ¶¶ 103-105, 107, 109-110. Thus, the Plaintiffs have set forth sufficient information and alleged facts as to cognizable legal theories to more than sufficiently demonstrate that they are entitled to the relief sought in the Complaint and the application of these unconstitutional statutes should not preclude these Plaintiffs from asserting and pursuing their claims based on the evidence and facts of this case.

## **CONCLUSION**

WHEREFORE, for the reasons set forth above and for those set forth in Plaintiffs' Opposition to Defendant Sudan's Motion to Dismiss, this Court should find the CSA and SCRA to be unconstitutional as the CSA and SCRA violate the Plaintiffs' Fifth Amendment rights to equal protection and their right to access the courts.  The United States and Sudan should not be permitted to reach or enforce selective, arbitrary and capricious "private" agreements that exclude these Plaintiffs. The Court should hold that the CSA and SCRA are unenforceable as applied to these Plaintiffs, should be invalidated and that no sovereign immunity should apply that would preclude Plaintiffs' claims.  These Plaintiffs are entitled to equal protection under the law.

January 3, 2023                           Respectfully Submitted,

                                          HEIDEMAN NUDELMAN & KALIK P.C.
                                          5335 Wisconsin Ave., Suite 440
                                          Washington, DC  20015
                                          Telephone:  202-463-1818
                                          Telefax:  202-463-2999
                                          Email:  trkalik@hnklaw.com


                                          By:_____*/s/ Tracy Reichman Kalik*_____
                                              Richard D. Heideman (No. 377462)
                                              Noel J. Nudelman (No. 449969)
                                              Tracy Reichman Kalik (No. 462055)
                                              Joseph H. Tipograph (No. 997533)

11