### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STUART E. STEINBERG**, *et al.*, | |
| *Plaintiffs,* | |
| **v.** | Case No. 20-cv-2996 (RCL) |
| **REPUBLIC OF SUDAN,** | |
| *Defendant.* | |

### <u>MEMORANDUM OPINION</u>

Plaintiffs in this case are U.S. citizens who were themselves injured, as well as the estates and family members of U.S. citizens who were injured or killed, by terrorist attacks carried out by the Islamic Resistance Movement ("Hamas") in Israel and Palestine. They ask the Court to hold the Republic of Sudan ("Sudan") liable under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(c), for materially supporting Hamas in carrying out the attacks. After plaintiffs filed the instant case, the United States and Sudan signed a bilateral agreement espousing and settling terrorism-related claims against Sudan and restoring Sudan's sovereign immunity in U.S. courts. Congress passed legislation implementing the agreement shortly thereafter. Accordingly, Sudan moves to dismiss plaintiffs' action for, among other arguments, lack of subject-matter jurisdiction. The United States intervenes in support of Sudan's position.

Another court in this District previously dismissed a similar complaint in *Mark v. Republic of Sudan*, No. 1:20-cv-03022 (TNM), 2021 WL 4709718 (D.D.C. Oct. 7, 2021).[1] Coming to the same conclusion, this Court will **GRANT** Sudan's motion to dismiss.

---

[1] The *Mark* plaintiffs appealed the dismissal to the United States Court of Appeals for the D.C. Circuit. *See* No. 21-5250 (D.C. Cir. Nov. 3, 2021). Oral argument was held on October 28, 2022. No opinion has been released as of the date of this filing.

## I.   BACKGROUND

### A.  Factual Background[2]

Plaintiffs are victims, family members of victims, and the estates of victims injured by Hamas in Israel and Palestine. Am. Compl., ECF No. 7, ¶¶ 1–36.[3] The United States has designated Hamas as a Specially Designated Global Terrorist Organization, Foreign Terrorist Organization, and Specially Designated Terrorist. *Id.* ¶ 96. Six families form the plaintiff group: the Steinberg, Henkin, Fuld, Goodman, Rosenfeld, and Vaknin families (collectively "plaintiffs"). *Id.* ¶¶ 1–36.

The Steinberg, Henkin, and Fuld plaintiffs are the surviving family members and estates of U.S. citizens killed by Hamas. *Id.* ¶¶ 1–24. On July 20, 2014, Max Steinberg, who was serving in the Israeli Defense Forces ("IDF"), died when a Hamas-launched anti-tank rocket hit his vehicle in Gaza, Palestine. *Id.* ¶¶ 43–46. On October 1, 2015, Eitam Henkin and his wife were shot in front of their four children by Hamas members during a kidnapping attempt in the Palestinian town of Beit Furik. *Id.* ¶¶ 47–48. On September 16, 2018, Ari Fuld was fatally stabbed by a Hamas member on his way to a shopping center in Gush Etzion Junction in Israel. *Id.* ¶¶ 51–52. Investigations confirmed that Hamas was responsible for the Henkin and Fuld deaths. *Id.* ¶¶ 49, 53.

The Goodman, Rosenfeld, and Vaknin plaintiffs suffer severe trauma as well as mental and emotional distress caused by actual and threatened Hamas attacks. *Id.* ¶¶ 25–36. Asher and Batsheva Goodman, Ephriam and Kineret Rosenfeld, Bracha and Yosef Vaknin, and their respective children all live in Israel near the Gaza border. *Id.* ¶¶ 56, 63–65, 79. All three families have observed Hamas-launched rockets, as well as incendiary balloons and kites, near their homes.

---

[2] The Court treats all the well-pleaded allegations as true. *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).

[3] The numbering of paragraphs in the Amended Complaint restarts on page 8. Citations to paragraphs in the Amended Complaint refer to the restarted paragraph numbers.

*Id.* ¶¶ 57, 65, 81. The parents fear that they and their children will be injured or killed by the explosives and that their children will mistake Hamas-launched incendiary balloons and kites for toys. *Id.* ¶¶ 58, 65, 82. Though none of these individuals have been physically injured by the explosives, the Rosenfelds' home was significantly damaged by a Hamas rocket on July 14, 2018. *Id.* ¶ 68. Many members of the Goodman, Rosenfeld, and Vakin families have sought counseling services in the past or are receiving such services in the present. *Id.* ¶¶ 60–61, 76–78, 87.

### B. Executive and Legislative Background

#### i. *Claims Settlement Agreement*

In 2019, nearly thirty years after the United States designated Sudan as a state sponsor of terrorism, the two countries began the process of restoring formal diplomatic relations after Sudan's transition to democracy. U.S. Mem. in Supp. of Def.'s Mot. to Dismiss ("U.S. Mem."), ECF No. 34, at 5–6. As part of the process of normalizing relations, the United States negotiated with Sudan to resolve then-pending terrorism-related lawsuits. *Id.* at 6.

On October 30, 2020, the United States and Sudan signed the bilateral Claims Settlement Agreement ("CSA"). *See* Claims Settlement Agreement, U.S.-Sudan, Oct. 30, 2020, T.I.A.S. No. 21-209 (entered into force Feb. 9, 2021), ECF No. 34-1. The preamble indicated that the agreement was part of a broader effort to "develop the relations between" the United States and Sudan "in a spirit of friendship and cooperation, especially in light of Sudan's ongoing transition to democracy[.]" *Id.* pmbl. The preamble further "[r]ecogniz[ed] and condemn[ed] the horrific nature of the 1998 bombings of the U.S. Embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, and the 2000 attack on the U.S.S. Cole, and express[ed] deepest sympathies for victims[.]" *Id.* Additionally, the preamble acknowledged "that certain victims of these attacks have asserted claims in U.S. courts against Sudan in relation to these attacks[,]" and "that while Sudan denies

3

any involvement in these attacks, it has been willing to address these claims as part of its effort to fully normalize relations with the United States[.]" *Id.* Finally, the preamble "acknowledg[ed] that Sudan has already paid compensation pursuant to certain private settlements to a number of victims of the 2000 attack on the U.S.S. Cole" and "recogniz[ed] Sudan's willingness to address additional claims arising out of the bombings of the U.S. Embassies and the attack on the U.S.S. Cole[.]" *Id.*

With these specific purposes in mind, the parties agreed that "[t]he objective of this Agreement is to reach a comprehensive settlement that" "settles the claims of the United States of America and, through espousal, those of U.S. nationals" where "such claims, suits, or actions arise from personal injury (whether physical or non-physical, including emotional distress), death, or property loss caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking or detention or other terrorist act, or the provision of material support or resources for such an act, occurring outside of the United States of America and prior to the date of execution of this Agreement." *Id.* art. II. The CSA's language closely resembles the text of the FSIA's terrorism exception to sovereign immunity, codified at 28 U.S.C. § 1605A(a)(1).[4] Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Mem."), ECF No. 23-1, at 2.

The CSA further provided that, upon the agreement's entry into force through legislation implementing it, U.S. law would broadly: (i) "provide[] the same sovereign, diplomatic, and official immunity to Sudan and its property . . . as is normally provided by the United States to

---

[4] That exception applies to:

> in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting in the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).

other states and their property[,]" and (ii) "bar[] and preclude[] all suits and actions specified in Article II[.]" *Id.* art. III(1) & V.

In return for this restoration of sovereign immunity and preclusion of terrorism-related suits, Sudan agreed to pay $335 million to compensate victims of three enumerated terrorist attacks. *Id.* art. III(2). These attacks were: (1) the August 7, 1998 bombing of the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania; (2) the October 12, 2000 bombing of the U.S.S. Cole in Yemen; and (3) the January 1, 2008 killing in Sudan of United States Agency for International Development employee John Granville. *Id.* annex(1). Specifically, the parties intended the funds to be used to compensate U.S. and foreign nationals who brought claims related to these attacks through nine identified lawsuits.[5]

Around the same time, the President certified to Congress his intent to rescind Sudan's designation as a state sponsor of terrorism. *See* Certification of Rescission of the Determination regarding the Government of Sudan (Oct. 26, 2020). Following the requisite waiting period, the Secretary of State formally rescinded the designation. *See* Rescission of Determination Regarding Sudan, 85 Fed. Reg. 82,565 (Dec. 8, 2020).

*ii. Sudan Claims Resolution Act*

Two months after the United States and Sudan signed the CSA, Congress passed the Sudan Claims Resolution Act ("SCRA"). SCRA, Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, tit. XVII, 134 Stat. 3291 (2020). The SCRA stated that it was the "sense of Congress that" "the United States should support Sudan's democratic transition"; "as part of the process of

---

[5] These cases were: *Owens v. Republic of Sudan*, No. 01-cv-2244 (JDB) (D.D.C.); *Wamai v. Republic of Sudan*, No. 08-cv-1349 (JDB) (D.D.C.); *Amduso v. Republic of Sudan*, No. 08-cv-1361 (JDB) (D.D.C.); *Mwila v. Islamic Republic of Iran*, No. 08-cv-1377 (JDB) (D.D.C.); *Onsongo v. Republic of Sudan*, No. 08-cv-1380 (JDB) (D.D.C.); *Khaliq v. Republic of Sudan*, No. 10-cv-356 (JDB) (D.D.C.); *Opati v. Republic of Sudan*, No. 12-cv-1224 (JDB) (D.D.C.); *Granville v. Republic of Sudan*, No. 2018-28 (P.C.A.); and *Taitt v. Islamic Republic of Iran*, No. 20-cv-1557 (RC) (D.D.C.).

restoring normal relations between Sudan and the United States, Congress supports efforts to provide meaningful compensation to individuals employed by or serving as contractors for the United States Government, as well as their family members, who personally have been awarded by a United States District Court a judgment for compensatory damages against Sudan;" and "the terrorism-related claims of victims and family members of the September 11, 2001, terrorist attacks must be preserved and protected." *Id.* § 1702, 134 Stat. at 3291.

SCRA provided that, if certain conditions were met: Sudan "shall not be subject to the exceptions to immunity from jurisdiction, liens, attachment, and execution under . . . section 1605A . . . of [the FSIA,]" "section 1605A(c) [of the FSIA] . . . and any other private right of action relating to acts by a state sponsor of terrorism arising under Federal, State, or foreign law shall not apply with respect to claims against Sudan"; and "any attachment, decree, lien, execution, garnishment, or other judicial process brought against property of Sudan" "shall be void." *Id.* § 1704(a)(1)(A)–(C), 134 Stat. at 3292. The Secretary of State was to provide Congress with a certification that the conditions were met in order to trigger the restoration of Sudan's sovereign immunity.[6] *Id.* § 1704(a)(2), 134 Stat. at 3293.

As to the scope of Sudan's new sovereign immunity, SCRA stated that such immunity "shall apply to all conduct and any event occurring before" the date of the Secretary of State's certification "regardless of whether, or the extent to which, application of that subsection affects any action filed before, on, or after that date." *Id.* § 1704(b), 134 Stat. at 3293. However, the SCRA specifically carved out from this general rule pending claims "in the multidistrict proceeding 03–MDL–1570 in the United States District Court for the Southern District of New York," litigation

---

[6] Those conditions were: (1) the Secretary of State's certification to Congress that Sudan's designation as a state sponsor of terrorism had been formally rescinded; (2) that Sudan made final payments with respect to the private settlement of claims by victims of the U.S.S. Cole bombing; and (3) that the United States received the funds to pay compensation to Granville's family and to victims of the embassy bombings. *See* SCRA § 1704(a)(2), 134 Stat. 3293.

relating to the terrorist attacks in the United States on September 11, 2001. *Id.* § 1706(a)(3), 134 Stat. at 3295; *see In re Terrorist Attacks on Sept. 11, 2001*, No. 03-mdl-01570 (S.D.N.Y.).

In April 2021, the Secretary of State certified that both the United States and Sudan had complied with their obligations under the SCRA. *See* Certification Under Section 1704(a)(2) of the Sudan Claims Resolution Act Relating to the Receipt of Funds for Settlement of Claims Against Sudan, 86 Fed. Reg. 19,080 (Apr. 12, 2021).

### C. Procedural Background

Plaintiffs are the U.S. citizen victims, family members of victims, and estates of victims of terrorist attacks allegedly carried out by Hamas in Israel and Palestine between 2014 and 2020. *See* Am. Compl. ¶¶ 1–36. Plaintiffs bring their case under 28 U.S.C. § 1605A(c), the FSIA's terrorism exception, advancing various tort theories of liability on the allegation that Sudan provided material support and resources to Hamas to carry out these attacks. *See id.* ¶¶ 111–28. Plaintiffs seek several forms of compensatory damages, such as economic damages, pain and suffering, and solatium, as well as punitive damages. *See id.* ¶¶ 114, 118, 123–28. Plaintiffs filed their original complaint on October 19, 2022. *See* Compl., ECF No. 1. Plaintiffs then filed an amended complaint approximately one month later. *See* Am. Compl. Plaintiffs served Sudan on February 27, 2022 under cover of diplomatic note, one of the valid methods of service prescribed in 28 U.S.C. § 1608(a). Return of Service, ECF No. 19.

In response, Sudan appeared and moved to dismiss the Amended Complaint under Federal Rules of Civil Procedure 12(b)(1), (b)(2), and (b)(6). Def.'s Mot. to Dismiss, ECF No. 23. Sudan argues that the CSA and SCRA restored its sovereign immunity in U.S. courts and terminated terrorism-related claims against it, and thus plaintiffs' case lacks personal jurisdiction, subject-

matter jurisdiction, and a valid private right of action.[7] *Id.* at 1. Plaintiffs challenge the CSA and SCRA as violative of their Fifth Amendment equal protection rights.[8] Pls.' Opp'n to Mot. to Dismiss ("Pls.' Opp'n"), ECF No. 24, at 14–15. Sudan in reply insists that both the CSA and SCRA are valid exercises of government power. *See generally* Def.'s Reply, ECF No. 28.

The plaintiffs filed a notice of a constitutional question, ECF No. 25, which this Court certified to the Attorney General under 28 U.S.C. § 2403(a), ECF No. 27. The United States then intervened, as of right, in support of Sudan and the constitutionality of the CSA and SCRA. *See* U.S. Mem. Plaintiffs filed a response to the United States' memorandum. Pls.' Resp. to U.S. Mem. ("Pls.' Resp."), ECF No. 35. The United States replied to plaintiffs' response. U.S. Reply, ECF No. 37. Sudan's motion is now ripe for review.

## II.    LEGAL STANDARD

The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Under the FSIA, foreign states are presumptively immune from the jurisdiction of U.S. courts subject to several enumerated exceptions. *See* 28 U.S.C. § 1604. A district court "has subject matter jurisdiction over a suit against a foreign state if—and only if—the plaintiff's claim falls within"

---

[7] Because the Court agrees with Sudan that this case must be dismissed for lack of subject-matter jurisdiction, the Court will not consider Sudan's alternative arguments.

[8] Sudan argues that plaintiffs' constitutional challenge is procedurally flawed because it was raised in an opposition brief instead of an amended complaint. Def.'s Reply, ECF No. 28, at 1–2. But this argument mischaracterizes pleading requirements. A plaintiff has no obligation to anticipate and respond to a defendant's potential defenses in the complaint, nor is a plaintiff's rebuttal to a defendant's affirmative defense equivalent to pleading a new claim for relief. *See Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 104 (D.D.C. 2006) ("Because sovereign immunity is in the nature of an affirmative defense, the plaintiff need not prove the absence of sovereign immunity in the first instance[.]"), *aff'd*, 531 F.3d 884 (D.C. Cir. 2008). Here, plaintiffs invoked the constitutionality of the statute at issue as a way of opposing Sudan's affirmative defense of sovereign immunity. Therefore, the constitutional question is properly before the Court.

one of these exceptions. *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 34 (D.C. Cir. 2014). "[I]f no exception applies, the district court has no jurisdiction." *Id.*

A court "generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in the suit (subject-matter jurisdiction)[.]" *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). If the court determines that it lacks subject-matter jurisdiction, it must dismiss the case. Fed. R. Civ. P. 12(h)(3). The standard of review for a motion to dismiss depends upon the purpose of the motion. *Dentons U.S. LLP v. Republic of Guinea*, 134 F. Supp. 3d 5, 7 (D.D.C. 2015). "[T]he Court examines subject matter jurisdiction with more scrutiny than in non-FSIA cases." *Id.* The Court must "assume the truth of all material factual allegations in the complaint," *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), and "construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). The Court may look to materials beyond the complaint to decide whether subject-matter jurisdiction exists. *See Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016). The plaintiff bears the burden of establishing subject-matter jurisdiction. *Simon v. Republic of Hungary*, 443 F. Supp. 3d 88, 99 (D.D.C. 2020).

### III.   DISCUSSION

Plaintiffs recognize that the SCRA, if valid, restores Sudan's sovereign and divests this Court of subject-matter jurisdiction. *See* Pls.' Reply at 1. Plaintiffs seek to avoid this outcome by arguing that the SCRA is unconstitutional in two ways under the Fifth Amendment's implicit equal-protection guarantee.[9] First, plaintiffs assert that the CSA violates the Fifth Amendment

---

[9] Plaintiffs bring their case under the Fifth Amendment's due process clause which provides, in relevant part, that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. const., amend. V. The Fifth Amendment, which applies to the federal government, does not contain an explicit equal protection clause. The

because it results in disparate treatment between those plaintiffs with terrorism-related actions against Sudan who can settle their claims and receive compensation—namely cases involving the identified U.S. embassy bombings, U.S.S. Cole attack, and death of Granville—and the instant plaintiffs, who cannot pursue their claims, thereby "distribut[ing] the benefits of the settlement in a selective, arbitrary, and capricious manner." Pls.' Opp'n. at 15–16. Plaintiffs also identify the SCRA's carve-out for the September 11, 2001 multidistrict litigation as a separate instance of arbitrary differential treatment. *Id.* at 16–17. Second, plaintiffs claim that the SCRA violates the Fifth Amendment because this disparate treatment impinges on a fundamental right, their access to the courts, as they are cannot pursue their claims against Sudan in U.S. courts while the claimants in the pending multidistrict litigation are still able to pursue their claims. *Id.* at 19.

If the portion of the SCRA restoring sovereign immunity to Sudan is unconstitutional, then the Court retains subject-matter jurisdiction if an exception to Sudan's sovereign immunity under the FSIA applies. If the statute is not unconstitutional, however, then the Court has no subject-matter jurisdiction and the Amended Complaint must be dismissed. Accordingly, the Court must address plaintiffs' substantive constitutional claims to arrive at a jurisdictional determination.

After review, the Court concludes that plaintiffs have failed to meet their burden to demonstrate that this Court maintains subject-matter jurisdiction over their case. Thus, the Court agrees with Sudan and the United States that the case must be dismissed.

---

Fourteenth Amendment, which applies only to the states, does contain such a clause and provides in relevant part, that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." *Id.*, amend. XIV. The Supreme Court has interpreted these respective clauses to mean that "the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive" and that "'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law[.]'" *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). Later, the Court confirmed that the "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 93 (1976). Therefore, this Court analyzes plaintiffs' constitutional challenges under the equal-protection lens.

### A. Plaintiffs Have Not Demonstrated that the CSA and SCRA Distinguish Among Different Claimants Without a Rational Basis

Plaintiffs first argue that the CSA and SCRA violate the Fifth Amendment's equal-protection guarantee by arbitrarily (1) espousing and settling claims of certain plaintiffs with terrorism-related cases against Sudan, (plaintiffs in the identified U.S. embassy bombings, U.S.S. Cole attack, and death of Granville), and (2) allowing other plaintiffs to proceed with their claims (plaintiffs in the identified September 11, 2001 multidistrict litigation) while denying their claims the same treatment. *Id.* at 15–16. Plaintiffs agree that this challenge is subject to rational-basis review but nevertheless argue that both distinctions bear no rational relation to the government's stated goals in the CSA and SCRA and thus impermissibly deny them equal protection of the law. *Id.* at 15. Sudan and the United States argue that the classifications easily survive rational-basis review. Def.'s Reply at 3; U.S. Mem. at 11. The Court agrees with Sudan and the United States.

Under rational-basis review, government action is "presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Because a statute survives where there is a mere "relation between the classification adopted and the object to be attained," rational-basis review is the "most deferential of standards" of review for constitutional challenges. *Romer v. Evans*, 517 U.S. 620, 632 (1996). "[I]t is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). "[T]hose attacking the rationality of the legislative classification have the burden" to demonstrate otherwise. *Id.* "A plaintiff bringing a constitutional challenge to a regulation on rationality grounds thus faces the unenviable task of refuting 'every conceivable basis which might support it.'" *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 396 (D.C. Cir. 2022) (quoting *Beach Commc'ns*, 508 U.S. at 315).

As a threshold matter, Sudan argues, and plaintiffs do not directly dispute, that restoring and improving diplomatic relations with Sudan is a legitimate U.S. state interest, that the executive branch has significant foreign affairs authority to negotiate settlement agreements with other nations, and that Congress has the authority to enact legislation operationalizing those agreements.[10] Def.'s Reply at 4–5. The Court agrees and sees no occasion to doubt the government's "sensitive interests in national security and foreign affairs" and "in preventing terrorism." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 36 (2010). And settlement of "outstanding claims by nationals of one country against the government of another country" is an effective way of resolving "sources of friction between the two sovereigns." *Dames & Moore v. Regan*, 453 U.S. 654, 679 (1981) (internal quotation marks and citation omitted). One such well-recognized form of settlement is espousal, "whereby one government adopts or 'espouses' and settles the claim of its nationals against another government." *Antolok v. United States*, 873 F.2d 369, 375 (D.C. Cir. 1989) (internal citation omitted). The federal government's "absolute power" "to espouse claims does not depend on the consent of the private claimholder." *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1523 (D.C. Cir. 1984) (Scalia, J.). Moreover, "[o]nce it has espoused a claim, the sovereign has wide-ranging discretion in disposing of it. It may compromise it, seek to enforce it, or waive it entirely." *Id.*

With these principles in mind, the Court will address plaintiffs' two challenged classifications in turn.

---

[10] In fact, contrary to plaintiffs' assertion, it is the executive's wide foreign affairs authority, and the executive's ability to enter into settlement agreements, that "is a longstanding policy," not any policy to "allow civil actions to proceed against those who support international terrorism." Pls.' Opp'n at 17; *Compare Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) (noting that "[m]aking executive agreements to settle claims of American nationals against foreign governments is a particularly longstanding practice, the first example being as early as 1799"), *with In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 79 (D.D.C. 2009) (noting that Congress first recognized a private cause of action for victims of state-sponsored terrorism in 2008).

Plaintiffs first claim that there is no rational basis for the CSA and SCRA's espousal, settlement, and disbursement of compensation for claims in the identified U.S. embassy bombings, U.S.S. Cole attack, and death of Granville but not claims such as theirs. Pls.' Opp'n at 15–16. Essentially, plaintiffs object to their denial of compensation while other plaintiffs are eligible for compensation. U.S. Mem. at 14–15.

Sudan offers a number of rational bases for treating the instant plaintiffs' claims differently from those other plaintiffs, including: (1) different procedural postures (the other plaintiffs' claims were resolved by the date of the CSA while the instant case was only just filed), Def.'s Reply at 6–8; (2) different judgment contexts (some of the other plaintiffs' claims were resolved through default judgments under a previous authoritarian Sudan while newly-democratic Sudan appeared here), *id.* at 6–7; (3) the presence of private settlement agreements (some of the other plaintiffs' claims were resolved this way while plaintiffs in the instant case seek to litigate their claims), *id.* at 7–8; (4) the scale and nature of the terrorist attacks at issue (other plaintiffs' claims involved targeting of specific U.S. government interests and personnel while plaintiffs here do not allege specific targeting), *id.* at 9–10; and (5) the timing of the actions (liability on other plaintiffs' claims was determined years ago while no court has ruled on the merits of the instant plaintiffs' claims), *id.* at 11–13.

Plaintiffs do not respond to all of Sudan's arguments, nor do they refute every conceivable basis for the CSA and SCRA. Thus, they fail to meet their burden under rational-basis review. *Beach Commc'ns*, 508 U.S. at 315. Moreover, far from Sudan's arguments being impermissible "after-the-fact rationalizations," Pl.'s Opp'n at 18, these justifications demonstrate that the CSA and SCRA were both entirely rational means of achieving the legitimate end of supporting a nascent democracy, securing justice for past victims of terrorism, and preventing

future terrorist attacks.[11] U.S. Mem. at 17. As it is well-established, "[d]efining the class of

persons" who may are eligible for compensation—"much like classifying [all] government

beneficiaries—"inevitably requires that some persons who have an almost equally strong claim

to favored treatment be placed on different sides of the line, and the fact that the line might have

been drawn differently at some points is a matter for legislative, rather than judicial,

consideration." *Beach Commc'ns*, 508 U.S. at 315–16 (internal citation omitted).

First, plaintiffs argue that classifying claims based on timing does not survive rational-

basis review because one of the cases included in the CSA's list of settlements for compensation,

*Taitt v. Islamic Republic of Iran*, 20-cv-1557 (RC) (D.D.C.), was not, in fact, filed years before.

Pl.'s Opp'n at 18. But as Sudan correctly points out, though *Taitt* was filed in 2020, that case

involved victims of the U.S.S. Cole attack, and a court determined Sudan's liability for that

attack nearly fifteen years before the CSA. Def.'s Reply at 6 (citing *Harrison v. Republic of

Sudan*, 882 F. Supp. 2d 23, 26–27 (D.D.C. 2012) (Lamberth, C.J.) and *Rux v. Republic of Sudan*,

495 F. Supp. 2d 541, 543 (E.D. Va. 2007)). Thus, *Taitt* fits neatly in the group of other cases

designated for compensation.[12]

Second, plaintiffs insist that differentiating between claimants who already held default

judgments against Sudan and those who did not is irrational because the CSA and SCRA also

permitted compensation for plaintiffs that engaged in certain private settlement agreements. Pls.'

Opp'n at 18. Plaintiffs' assertion fails for the same reason as their previous argument—these

---

[11] What is more, after-the-fact rationalizations are perfectly acceptable, because a statute passes rational-basis review if one can even *hypothesize* that the policymaker *might have* enacted the policy for a certain reason. *See Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487–88 (1955).

[12] Plaintiffs further argue that timing is not a rational classification because they timely filed their claims as required under 28 U.S.C § 1605A(b)(2). Pls.' Opp'n at 18. But, as discussed above, it is the fact of *when* the claim was filed, and specifically the fact that liability was already determined at the time of the CSA, not whether the claim *could* be filed, that matters for the timing classification.

private settlement agreements were already in existence at the time of the CSA and therefore presumably included in the executive branch's bargain.[13] Furthermore, given Sudan's necessarily finite resources, limiting compensation to "claims where [Sudan] was already on the hook was rational." *Mark*, 2021 WL 4709718, at *3. Plaintiffs' response is that the CSA and SCRA are ambiguous as to whether the private settlement agreements they contemplated were those already paid or shortly would receive payment, as Sudan and the United States argue, or could be paid using the settlement funds, as plaintiffs read it. Pl.'s Resp. at 2–5. This argument elides the point. It is the resolved or unresolved nature of the cases, not the timing of the compensation, that is the basis of the rational distinction between these two groups of plaintiffs. *See* U.S. Reply at 4.

Plaintiffs argue that the SCRA's carveout for September 11, 2001 victims does not further the CSA's stated aims, echoed in the SCRA, of restoring the United States' relationship with Sudan by settling and providing compensation for some claims against Sudan, and barring all other terrorism-related suits against Sudan. *See* Pls.' Opp'n at 16–17; CSA, preamble & art. II; SCRA § 1702, 134 Stat. at 3291. Notwithstanding the fact that the stated reasons for a statute have no constitutional relevance, *see Beach Commc'ns*, 508 U.S. at 307, Sudan offers various rational bases for the SCRA's disparate treatment of plaintiffs' claims as compared to the September 11, 2001 claims, summarized as "[t]he *sui generis* nature of the 9/11 attacks and Congress's unique treatment of the victims." Def.'s Reply at 10–11 (describing how the attacks resulted in nearly 3,000 deaths, how the attacks targeted specific U.S. commercial, government, and military landmarks, and how Congress passed various statutes and set up a compensation scheme addressed at benefitting victims); *see* U.S. Mem. at 13–14.

---

[13] It is for this reason that the Court need not reach Sudan's alternative argument in response: that neither the settlement agreements themselves nor the U.S. government's action in distributing funds pursuant to the agreements are subject to constitutional challenges because the agreements are between private parties and the U.S. government's role is "merely carrying out the terms of th[o]se private agreements." Def.'s Reply at 14.

Plaintiffs' claims, on the other hand, relate to attacks occurring outside of the United States. Def.'s Reply at 11; U.S. Mem. at 13. Plaintiffs rspond that it is "nonsensical" and "[un]justifiable" to distinguish between their claims and the victims of the September 11, 2001 attacks merely because of the location of the attacks. Pl.'s Resp. at 7. To the contrary, it is plainly rational for the executive and Congress to prioritize claims "concern[ing] a terrorist attack on U.S. soil" over claims arising elsewhere. *Mark*, 2021 WL 4709718, at *3.

As a last-ditch effort, plaintiffs insist that the rational bases offered by Sudan are "merely a pretext for disparate treatment" and that this Court should ignore them. Pls.' Resp. at 5. But as the United States points out, this Circuit has not held that an allegation of pretext overcomes an otherwise rational justification for a law, and one court in this District already rejected such an argument. U.S. Reply at 4 (citing *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 77 (D.D.C. 2015)).

Here, the executive branch validly exercised its vast power to espouse, settle, and resolve claims of U.S. citizens against a foreign sovereign as part of a broader effort to normalize diplomatic relations with that sovereign. *See Asociacion de Reclamantes*, 735 F.2d at 1523. Furthermore, Congress validly exercised its power to codify the executive's international agreement into domestic law, strip courts of jurisdiction to hear plaintiffs' claims, and to remove the associated private cause of action. *See Patchak v. Zinke*, 138 S. Ct. 897, 906 (2018) ("[When] Congress strips federal courts of jurisdiction, it exercises a valid legislative power."); *Bank Markazi v. Peterson*, 578 U.S. 212, 236 (2016) ("[I]t remains Congress' prerogative to alter a foreign state's immunity and to render the alteration dispositive of judicial proceedings in progress.").

Because plaintiffs have not met their burden to prove that the CSA and SCRA do not distinguish among claimants without a rational basis, the Court does not hold otherwise.

### B. Plaintiffs Have Not Demonstrated that the CSA and SCRA Unconstitutionally Impair Their Right to Access Courts

In the alternative, plaintiffs claim that the CSA and SCRA violate the Fifth Amendment's equal-protection guarantee of access to courts and, because access to courts is a fundamental right, the CSA and SCRA are therefore subject to strict-scrutiny review. Pls.' Opp'n at 20. Specifically, they assert that the SCRA's restoration of Sudan's sovereign immunity prevents a court from adjudicating terrorism-related claims against Sudan but allows the victims of the September 11, 2001 terrorist attacks to pursue their claims, and therefore this classification is not narrowly tailored to serve a compelling government interest. *Id.*

"When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978). The Supreme Court has recognized that access to courts is a fundamental right protected by the Fifth Amendment. *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). However, this fundamental right applies only to two narrow categories of denial-of-access scenarios. *Id.* at 413–14 (collecting cases). The first category, for "forward-looking" claims, concerns cases where "official action is presently denying an opportunity to litigate for a class of plaintiffs," such as prisoners' access to courts or excessive mandatory filing fees preventing indigent parties from litigating their claims. *Id.* at 413, 415 (internal citations omitted). The second category, for "backward-looking" claims, concerns cases where official action "may allegedly have caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief." *Id.* at 414 (internal citations omitted).

Plaintiffs' claim plainly does not fall into either of the recognized lines of denial-of-access cases. Plaintiffs are freely able to enter U.S. courts and sue any other defendant under the same theory they press against Sudan. In fact, plaintiffs have already done so—they are currently pursuing multiple cases against the Islamic Republic of Iran and the Syrian Arab Republic before the undersigned for materially supporting Hamas in the same attacks as those at issue here. *See Steinberg v. Islamic Republic of Iran*, No. 17-cv-1910 (RCL) (D.D.C.); *Henkin v. Islamic Republic of Iran*, No. 18-cv-1273 (RCL) (D.D.C.); *Fuld v. Islamic Republic of Iran*, No. 20-cv-2444 (RCL) (D.D.C.). Plaintiffs have already obtained a judgment or a finding of liability in two of the three cases. *See Steinberg*, ECF Nos. 19, 33–34; *Henkin*, ECF No. 31. Nor can plaintiffs point to negligent or improper official action preventing their ability to sue or causing the loss of a meritorious case. To the contrary, the official action here was valid. *See Clay v. Socialist People's Libyan Arab Jamahiriya*, 614 F. Supp. 2d 21, 23 (D.D.C. 2009) ("[S]ubject-matter jurisdiction of the lower federal courts is determined by Congress 'in the exact degrees and character which to Congress may seem proper for the public good.'") (quoting *Amerada Hess*, 488 U.S. at 433). And restoring Sudan's sovereign immunity and eliminating the terrorism-related cause of action does not prevent plaintiffs from pursuing their claims in another forum. Def.'s Reply at 20.

Plaintiffs rely on *Dames & Moore* to insist that they have been denied access to a forum to hear their claims, but this reliance is misplaced. Plaintiffs argue that Congress's establishment of a claims resolution and compensation disbursement procedure was the primary, or at least a very significant, reason that the Supreme Court validated the U.S. government's settlement of claims against Iran in that case. Pls.' Resp. at 8–9 (citing *Dames & Moore*, 453 U.S. at 680, 686–87). But *Dames & Moore* does not stand for the proposition that an alternative forum *must* be provided when the executive settles citizen claims; the existence of an alternative forum only "buttressed"

the Supreme Court's conclusion that the President did not exceed his authority when he, pursuant

to an executive agreement, issued executive orders and regulations that "nullified attachments and

liens on Iranian assets in the United States, directed that these assets be transferred to Iran, and

suspended claims against Iran that may be presented to an International Claims Tribunal." *Dames

& Moore*, 453 U.S. at 660, 686.

Finally, plaintiffs' comparison of the CSA and SCRA to a 2008 settlement agreement

between the United States and Libya is inapposite. Plaintiffs claim that the CSA and SCRA denied

plaintiffs' claims without compensation, while the other agreement "ensur[ed] that all U.S.

nationals with terrorism claims were included in" the agreement. Pls.' Resp. at 9 (citing Libyan

Claims Resolution Act, Pub. L. No. 110-301, 122 Stat. 2999 (2008)). Assuming without deciding

that plaintiffs' assertion is true—that the executive chose to settle one set of claims one way but

another set of claims differently—it is not for this Court to review. *Mark*, 2021 WL 4709718, at

*4 ("With the power to settle claims comes the power to settle them imperfectly. [Plaintiffs]

essentially ask for the Court to rule that the executive branch should have negotiated better. This

it will not and cannot do.").

The courthouse doors are plainly not closed to plaintiffs. Therefore, they have not been

denied a fundamental right and are unable to challenge the CSA and SCRA on a strict-scrutiny

basis.[14]

\*     \*     \*

The Court concludes that plaintiffs have not met their burden to demonstrate that the CSA

and SCRA are unconstitutional under the Fifth Amendment.

---

[14] Because the Court agrees that plaintiffs have not established that their case falls within the recognized denial-of-access cases, the Court need not address Sudan's alternative argument that the CSA and SCRA survive strict scrutiny. Def.'s Reply at 20–21.

### C. The Court Lacks Subject-Matter Jurisdiction Over the Case

Having determined that the CSA and SCRA are constitutional, the Court returns to the only issue remaining for disposition: the existence of subject-matter jurisdiction. The CSA and SCRA were valid exercises of executive and legislative power. *See Patchak*, 138 S. Ct. at 906; *Bank Markazi*, 578 U.S. at 236. Together they restored Sudan's immunity in U.S. courts and removed the FSIA's private cause of action for terrorism-related cases. Because Sudan is now immune from suit, this Court lacks jurisdiction over plaintiffs' case. *See Amerada Hess*, 488 U.S. at 434.

## IV.    CONCLUSION

For the foregoing reasons, this Court lacks subject-matter jurisdiction and must dismiss the case. A separate Order shall issue.

SIGNED this ___29th___ day of March, 2023.

Royce C. Lamberth
United States District Judge